**SO ORDERED.**

**SIGNED this 02 day of July, 2009.**



_____
**ROBERT E. NUGENT**
**UNITED STATES CHIEF BANKRUPTCY JUDGE**
_____

OPINION DESIGNATED FOR ON - LINE PUBLICATION
BUT NOT PRINT PUBLICATION

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE: ) | |
| ) | |
| JOSEPH E. MATHEWS, III, ) | Case No. 08-10871 |
| DEBRA D. MATHEWS, ) | Chapter 7 |
| ) | |
| Debtors. ) | |
| _____) | |

## MEMORANDUM OPINION

The United States Trustee (UST) moves for an examination of the debtors' transactions with their attorney, Mark J. Lazzo, pursuant to 11 U.S.C. § 329 and Fed. R. Bankr. P. 2017.[1] The UST argues that, in light of numerous errors and inaccuracies in the filings in this case, Mr. Lazzo received more in fees than the reasonable value of his services to the debtors. Section 329(b)

---

[1] Dkt. 77.

authorizes the Court to order the return of any amount paid to debtors' counsel that exceeds that reasonable value. The Court conducted an evidentiary hearing on this motion on March 17, 2009 wherein attorney Lazzo and debtor Joseph Mathews testified. The Court admitted numerous documents into evidence and took judicial notice of the Mathews' bankruptcy case file. After careful review of the record and the pertinent authorities, the Court is ready to rule.

Jurisdiction

This is a contested matter governed by Fed. R. Bankr. P. 9014 and is a core proceeding under title 11, over which the Court has jurisdiction pursuant to 28 U.S.C. § 157(b)(2)(A) and § 1334(b).

Findings of Fact

Debtors filed their voluntary chapter 7 petition on April 18, 2008. The Rule 2016(b) disclosure filed with the petition indicates that debtors paid Lazzo $2,000 for his legal services in this case.

Sometime in 2007, Joseph Mathews consulted attorney Lazzo concerning his deteriorating financial situation and possible bankruptcy. Mathews was a construction contractor and had a foundation repair business. Lazzo advised Mathews on selling the foundation business in an effort to avoid bankruptcy and save the construction business.[2] Mathews tried unsuccessfully during 2007 to sell several speculative homes. Ultimately, Mathews' lenders foreclosed their mortgages on these spec homes. Then Mathews sold all his equipment and paid what he could on his secured debt. When he filed this petition, Mathews scheduled secured debt to lenders in excess of $1,000,000 to

---

[2] According to Mathews, debtors lived off of the foundation business sale proceeds during 2007.

lenders that was secured by mortgages on various other construction projects.[3]

In March of 2008, Mathews entered into an arrangement with his father-in-law, Delbert Cowel, to act as the general contractor in building Cowel a new home. Cowel paid Mathews funds to in turn pay his vendors and subcontractors; those funds were deposited into two accounts at Credit Union of America and Equishare Bank. Cowel's house was incomplete at the petition date, but debtor continued to work on it. There remained substantial funds in those accounts, but debtor claimed to hold those funds "in trust" for his father-in-law. Debtor did not receive any money to build Cowel's house until after construction was completed in June of 2008. According to Lazzo, debtors had no income in 2008 prior to filing.

The UST's primary complaints about Lazzo's work for the Mathews are, first, that Mathews' schedules were inaccurate and incomplete and, second, that Lazzo did not adequately advise the Mathews on the necessity of reading and reviewing the schedules before they were signed and filed. The inaccuracies may be summarized as follows. On the Statement of Financial Affairs (SFA) filed with the petition, debtor reported receiving $845,000 in gross income in 2006, $0 in 2007 and $0 in 2008. In fact, Mathews had significant, six-figure gross income in 2007, and a much smaller amount in 2008. Question 14 of the SFA solicits information about property the debtor holds for others. Notwithstanding that Mathews held several thousand dollars of his father-in-law's funds in his accounts, he answered Question 14 of the SFA "none." While the existence of three bank accounts was reported on Schedule B, they were only valued at $100 each. Schedule B also reported

---

[3] *See* Schedule A. Other than debtors' car loans and home mortgage loan, these construction business debts comprised all of debtors' secured creditors' claims. *See* Schedule D. Debtors had no priority debt and scheduled approximately $172,000 of general unsecured debt, the bulk of which appear to be credit card debt.

-3-

only two vehicles when, in fact, debtor was shown as a title owner of some six vehicles, four of which were also owned and paid for by his children.

The UST's complaint about Lazzo's advice to debtors stemmed from Mathews' statement at the § 341 meeting that he hadn't read the schedules or SFA before signing them. At the first meeting, when the UST examined Mathews concerning his income, Mathews was "stunned" to hear of the $845,000 income listed on the SFA for year 2006, and claimed it was a "typo." As was later shown, Mathews had significantly less <u>net</u> income in 2006, but the SFA calls for <u>gross</u> income and the $845,000 amount was indeed accurate. In addition, the SFA declared $0 income for year 2007 when in fact, according to debtors' tax return, they had $261,768 gross income from the construction business.[4] Lazzo testified that he did not have the debtors 2007 tax return at the time the case was filed and the tax preparer's June 2008 date on the return supports that testimony. But when Lazzo filed an amended SFA in August of 2008, debtors reported only $64,544 of <u>net</u> income.[5] The UST also asserted that Lazzo should have gleaned from the debtor's bank statements that the amounts in each bank account, some $10,000 and $12,000, far exceeded the $100 shown. Lazzo conceded that he did not have the April bank statements to review prior to filing and he could not say whether the February or March bank statements would have shown the Cowel funds in the bank accounts.

The Court heard both Lazzo's and Mathews' testimony about the manner in which the schedules were assembled and the extent to which the Mathews reviewed them. Lazzo and Mathews had a long-standing relationship. Their children had participated in sports together and they knew each other outside the legal context. As Mathews wound down his business, he worked with Lazzo.

---

[4] Ex. 8.

[5] Ex. 5.

-4-

When he engaged Lazzo in the summer of 2007, Mathews paid him a retainer of $2,000, the fee that Lazzo ultimately claimed for the bankruptcy. Lazzo described his dealings with Mathews in a positive light, noting that the liquidation took some time, but that both Lazzo and Mathews knew that bankruptcy lay at the end of the road. Lazzo indicated that Mathews provided him all the information he requested and did not hide anything. Lazzo gathered the filing information from Mathews and drafted schedules sometime in the Spring of 2008. He then transmitted the schedules and SFA to Mathews and directed him and Mrs. Mathews to review them for accuracy. He had them visit his office and gave them some time to review the papers. Mathews testified that Lazzo gave him a draft to take home and that he "looked it over," not line-by-line, but with a view toward seeing that all of the creditors were included. He testified that Lazzo told him it was important to get the papers right.

Mr. Lazzo has been a regular practitioner in this Bankruptcy Court for more than 20 years. He has the demonstrated ability to represent many different types of debtors in each chapter and, in this Court's experience, is a very capable bankruptcy lawyer who represents his clients well. Lazzo testified that it is his practice to prepare schedules, then sit down and review them with his clients. He also testified that he imparts to them the importance of accuracy, but he is of the opinion that some lay-people understand this better than others. This comports with this Courts' experience in representing debtors over 20 years of practice. Lazzo admitted that he did not have an opportunity to study the bank statements or the car titles. He believed that Mathews told him the truth in their interviews. Lazzo rated his handling of this case a "B+" at best.

A review of the time line in this case shows the difficulties that Lazzo and the debtors had completing the record. Debtors filed their case April 18, 2008 and D. Michael Case was appointed

Trustee. A month after the case was filed, debtors amended Schedule B to reflect additional vehicles. For reasons unknown, the debtors missed the first two § 341 settings and, on June 18, 2008, trustee Case filed a motion to dismiss. That motion was withdrawn and debtors appeared for a § 341 meeting in July. At that time, trustee Case and the UST questioned the debtors about their affairs and Mathews' answers served to clarify, to some degree, the issues concerning the vehicles and the accounts. On July 13, 2008, before the § 341 meeting, the UST filed a motion to dismiss the case for cause under § 707(a), alleging unreasonable delay by debtors prejudicial to creditors. The UST cited debtors' failure to attend the § 341 meeting and to provide bank statements requested. After a period of discovery, the UST withdrew its motion to dismiss. After the § 341 meeting, trustee Case filed a notice of no distribution (NDR) and abandonment. In August of 2008, debtors amended the SFA, but only to show Mathews' net income for 2007 (gross income is what is required to be shown). No change was made to the debtors' initial response to SFA Question 14. Thereafter, on October 17, 2008, the UST convened a special creditors' meeting and examined the debtors at length concerning these issues.[6] On November 26, the UST filed the present motion.[7] Only on January 9, 2009 did debtors again amend their SFA to reflect Mathews' 2007 gross income and amend the prior response to question 14. This time, debtors revealed that the funds in the bank accounts were, in fact, the property of Mr. Cowel. Debtors also amended their Schedule B to reflect an accurate list of vehicles.

Analysis

The UST proceeds under § 329 which allows the Court to examine the debtors' transactions

---

[6] There is no docket entry concerning this "special meeting."

[7] Dkt. 77.

-6-

Case 08-10871    Doc# 97    Filed 07/02/09    Page 6 of 12

with counsel; if counsel has received more in fees than the Court deems reasonable, the Court may order some or all the fees disgorged.[8] Once the UST raises a question of the reasonableness of counsel's fees, the attorney bears the burden of proving his fee was reasonable.[9] The factors set out in § 330(a)(3) are typically examined when determining a reasonable attorney's fee.[10] Agreed upon compensation of a debtor's attorney may be excessive for a variety of reasons, including the size of the fee, counsel's failure to disclose the compensation as required by § 329(a), or conduct by the attorney that diminishes the value of the legal services.[11]

At argument, the UST relied heavily on the ruling in *In re Withrow*, a Massachusetts bankruptcy case where debtors' counsel was sanctioned by a bankruptcy court for submitting schedules and SFA so lacking that the judge found several violations of Fed. R. Bankr. P. 9011.[12] In *Withrow*, the bankruptcy court articulated a five-question standard for determining whether an attorney should be required to disgorge fees for inaccurate filings. As that Court stated,

---

[8] *See In re Bartmann,* 320 B.R. 725, 751 (Bankr. N.D. Okla. 2004) (The purpose of § 329 is to protect creditors and the debtors from overreaching by attorneys); *In re Merriam*, 250 B.R. 724, 731 (Bankr. D. Colo. 2000).

[9] *In re Mahendra,* 131 F.3d 750, 757 (8th Cir. 1997) (Trustee filed a motion for review of attorney fees and motion for sanctions under Rule 9011.); *In re Bartmann*, *supra.*

[10] *In re Davis*, 2006 WL 2404015 at *2 (Bankr. E.D. Okla. 2006) (finding $1,500 (including filing fee) to be reasonable, denying disgorgement, and setting a presumptively reasonable fee of $1,250 in a simple, no asset chapter 7 case); *In re Jones,* 236 B.R. 38, 41 (D. Colo. 1999) (reasonableness of debtor's counsel's fee is determined in the same manner as other fee awards with resort to the *Johnson v. Georgia Highway Exp., Inc.* factors that are relevant in bankruptcy proceedings).

[11] *In re Merriam, supra* at 732.

[12] *In re Withrow,* 391 B.R. 217 (Bankr. D. Mass. 2008), *aff'd* 405 B.R. 505 (1st Cir. BAP 2009) (Sanctioning counsel $3,585, three times the amount the attorney intended to charge debtor for his services).

> (1) did the attorney impress upon the debtor the critical importance of accuracy in the preparation of documents to be presented to the Court; (2) did the attorney seek from the debtor, and then review, whatever documents were within the debtor's possession, custody or control in order to verify the information provided by the debtor; (3) did the attorney employ such external verification tools as were available and not time or cost prohibitive (e.g., on-line real estate title compilations, on-line lien search, tax "scripts"); (4) was any of the information provided by the debtor and then set forth in the debtor's court filings internally inconsistent-that is, was there anything which should have obviously alerted the attorney that the information provided by the debtor could not be accurate; and (5) did the attorney act promptly to correct any information presented to the Court which turned out, notwithstanding the attorney's best efforts, to be inaccurate. These questions can be further simplified and reduced to one question, their common denominator: Did the attorney do his or her level best to get it right? More can not, and should not, be asked of any attorney.[13]

As noted, *Withrow* was a § 707(b)(4) case. Section 707(b)(4) applies to allow the recovery of attorneys fees and costs when a motion to dismiss is brought under that subsection. While § 707(b)(4) does not apply here, a motion to dismiss was brought by the UST in this case, but later withdrawn. This Court is persuaded that consideration of these five questions is necessary to a fair analysis of whether an attorney's fees should be recovered under § 329(b).[14]

Here, it appears that Lazzo tried to impress upon Mathews the importance of accuracy in filing the schedules. As Mathews testified, he took care to insure that all of the creditors were listed, but scanned the rest of the filings. It is less clear that Lazzo secured the necessary documents to effectuate a reliable review to verify what Mathews told him. Lazzo admitted that he failed to secure and review the April bank statements and the existence of the Cowel deposits only came to

---

[13] 391 B.R. at 228.

[14] These questions indirectly invoke the relevant factors enumerated in § 330(a)(3). In particular, the Court believes these questions go to the heart of whether the attorney's conduct diminished the value of the legal services provided or justify the amount of the fee for the services performed.

-8-

light through trustee Case's efforts later. The 2007 tax return was not available at the time of filing, but such a large income discrepancy between years 2006 and 2007 should have led Lazzo to make pointed inquiry of Mathews. Lazzo conceded that in a perfect case, he should have obtained Mathews' internal accounting records in an effort to fix the amount of the 2007 gross income. Nor did Lazzo secure and review the vehicle titles, choosing to rely instead upon what Mathews told him. In determining whether Lazzo employed "external verification tools," the Court notes that Lazzo could have performed a vehicle title search on the Internet. The only matter of internal inconsistency was the 2007 income: surely Mathews and Lazzo both knew that the debtor would have some income for that year since the construction business was still being operated when Mathews came to Lazzo in 2007. Finally, Lazzo acted promptly to correct some of the inaccurate information that was presented, but the SFA, including both the income figures and the disclosure concerning the father-in-law's funds held in Mathews' accounts, was not accurate until January of 2009, some eight months after the case was filed, and after two attempts to get it right.

Lazzo admitted at trial that this was a "big" case that he "*knew*" would draw the attention of the UST because of the reported large income, no income, and sale proceeds. This pre-petition recognition does not appear to have spurred Lazzo to do anything more to ensure the accuracy of the schedules and SFA than he normally would. If there was ever a case to inquire and verify the debtors' information, this would seem to be it. In fairness to Lazzo, the debtor appeared in the case and testified under oath on two occasions and, in the course of those appearances, supplemented the missing or inaccurate information contained on the filings. It is not unusual for counsel to rely on the assurances of a client that he knows well, but it may not be wise. None of the missing information harmed the creditors per se, but its absence caused significant extra work on the part

-9-

of the UST and, likely, the case trustee. Inaccurate or missing information, especially inaccuracies or omissions that should have manifested themselves to both debtors and counsel upon even a surface review of the papers, cause unnecessary inconvenience and expense to the other actors in the bankruptcy system. While it is clear that Mr. Lazzo worked hard for the Mathews over a period of many months, the Court cannot say that he did his "level best" here because this Court has seen him do better.

Still, circumstances militate against disgorgement in this case. First, the Court has not encountered previous situations in which this lawyer has been accused of this sort of conduct. In *Withrow*, the sanctioned attorney had been twice sanctioned for similar activities before. Second, although it ended up being a no asset case, this is, as a practical matter, a complex business case and, while the explanations were a long time in coming, they eventually came. Lazzo may have justifiably relied on his client's attention to detail in reviewing the schedules. One questions what he could have done beyond advising his client that accuracy mattered, providing his client with a draft copy of the papers, and being present in the office while his client reviewed them.

Further, it is clear that a substantial amount of the time spent by counsel on this case was expended prior to filing and incident to the attempted "workout" phase of the representation. Lazzo did not seek any additional fee for his bankruptcy services from the initial fee he obtained in 2007 when Mathews first contacted him. In the absence of any record on the point, this Court would have to guess what portion of the fee should be returned as being "unreasonable." The only § 330(a)(3) factors that can be fairly applied here are whether Lazzo has demonstrated skill and experience in the bankruptcy field and whether his compensation in this case is reasonable in consideration of

-10-

what other similarly experienced practitioners charge for like work.[15] As noted above, Lazzo has demonstrated skill and experience in this area.

With respect to what other practitioners charge for similar work, the Court notes that this District does not recognize a presumptively reasonable fee in chapter 7 cases. Based on the Court's general familiarity with Rule 2016 disclosures in consumer chapter 7 cases filed in the Wichita Division, debtor's attorney fees range anywhere between $850 to $2,000. Chapter 7 business cases run at the high end of that range and can cost more. Here, there is no way, other than making an educated guess based on its own practice experiences, that the Court can allocate the $2,000 Lazzo received between his pre-bankruptcy workout work and his activities related to the preparation and filing of this case. Recalling the substantial amounts of time often devoted to workout efforts, the Court assumes that much of the $2,000 was exhausted in that pursuit. Given Lazzo's substantial pre-petition involvement, the Court cannot conclude that $2,000 was an unreasonable fee for this engagement.

Finally, were the Court to order Lazzo to disgorge, it is unclear that any creditors would benefit. The case trustee has filed an NDR. The debts in this case are significant. Even if this Court ordered a disgorgement of one-half the fees, or $1,000, it would question the efficacy of requiring the trustee to reopen the case to administer such a small amount of money to pay what will likely be a minuscule dividend. There is no reason to punish trustee Case for debtors' and counsel's errors.

Conclusion

The Court heartily agrees with the UST that the integrity of the bankruptcy system relies on

---

[15] In the absence of any evidence concerning time spent or rates charged, the Court cannot consider the first four § 330(a)(3) factors, all of which are quantitative in nature.

-11-

Case 08-10871    Doc# 97    Filed 07/02/09    Page 11 of 12

the completeness and veracity of the initial filing documents. When the Court, the creditors, and other parties cannot rely on those documents, they are sorely prejudiced. That the omissions in this case do not rise to a level that warrants disgorgement of the debtors' counsel's fees does not mean that such omissions in different or more egregious circumstances will be ignored. Unlike *Withrow*, this motion was not brought under § 707(b)(4) or Fed. R. Bankr. P. 9011. No sanction was requested against Mr. Lazzo other than a partial disgorgement. Nevertheless, counsel need to understand that their goal in filing bankruptcy petitions and supporting documents should always be complete accuracy on the first submission. Anything less, at a minimum, inconveniences the other parties, even in the absence of ill-intent. Anything less than a good faith effort to submit completely accurate filings will be viewed from the bench with alarm and may be answerable accordingly. In the circumstances of this case, however, no disgorgement is warranted. The UST's motion for a disgorgement of fees in this case is DENIED.

# # #